968 F.2d 1570
 23 Fed.R.Serv.3d 224
 UNITED STATES of America, Appellee,
Sheet Metal Workers Local 38 and International Brotherhood
of Teamsters Local 810, Intervenor-Appellees,
v.
Martin SCHWIMMER, Defendant,
Dershowitz & Eiger, Appellant.
 Nos. 972, 1317, Dockets 91-1629, 91-1738.
 
 1
 Second Circuit.
 
 Argued March 25, 1992.
Decided July 13, 1992.
 
 2
 Jody Kasten, Asst. U.S. Atty., New York City (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Robert L. Begleiter, Varuni Nelson, M. Lawrence Noyer, Jr., Asst. U.S. Attys., on the briefs), for appellee U.S.
 
 
 3
 Deborah Hunt Devan, Baltimore, Md. (Weinberg and Green, Baltimore, Md., Sidney L. Meyer, Attorney at Law, New York City, on the briefs), for intervening appellees Sheet Metal Workers Local 38 and Intern. Brotherhood of Teamsters Local 810.
 
 
 4
 Nathan Z. Dershowitz, New York City (Victoria B. Eiger, Dershowitz & Eiger, P.C., on the briefs), for appellant Dershowitz & Eiger, P.C.
 
 
 5
 Before: NEWMAN, CARDAMONE, Circuit Judges, and WOOD, District Judge.[1]
 
 KIMBA M. WOOD, District Judge:
 
 6
 This case concerns the payment of attorneys fees to Dershowitz & Eiger, P.C. ("D & E"), counsel for Defendant Martin Schwimmer in appellate criminal proceedings. The appeal results from the Hon. Arthur D. Spatt's September 30, 1991 refusal to approve a stipulation between Martin Schwimmer and the Government permitting Martin Schwimmer to withdraw $55,000 from a court-controlled bank account in order to pay D & E attorneys fees. The District Court denied a motion to reconsider that decision on December 10, 1991. D & E now appeals the September 30 and December 10 decisions. For the reasons stated below, we remand this case to the District Court.BACKGROUND
 
 
 7
 Martin Schwimmer was convicted in October of 1988 on racketeering charges in the Eastern District of New York, the Hon. Joseph McLaughlin presiding. See United States v. Schwimmer, 924 F.2d 443 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 55, 116 L.Ed.2d 31 (1991). In lieu of a jury trial on the Government's forfeiture charges against Schwimmer pursuant to 18 U.S.C. § 1963, Schwimmer and the Government entered into a "RICO Forfeiture Settlement Agreement" on February 14, 1989. In that agreement, Schwimmer agreed that he was indebted to the Government in the amount of $4.5 million. In order to satisfy this obligation, he is required to use all of his cash and assets (which were listed in a schedule appended to the agreement), with the exception of a house and car, and with the exception of $100,000 to pay bona fide attorneys fees. The agreement provided that if liquidation of these assets fell short of the $4.5 million, Schwimmer would remain personally liable for the shortfall. The agreement also required Schwimmer to deliver certain security instruments and other documents to the Government, and to deliver certain gems and motor vehicles to Government-approved auctioneers.
 
 
 8
 Two other clauses of the Agreement are particularly relevant. One clause states: "[t]his document contains the entire agreement between the parties concerning the subject matter hereof and may not be changed or terminated except by a writing signed by the party against whom enforcement of such change or termination is sought." Another clause states that in the event of reversal on appeal, the agreement shall be void and all cash and assets delivered to the Government shall be returned.
 
 
 9
 Judge McLaughlin approved the agreement. He also stated, in sentencing Schwimmer, that he was ordering the forfeiture of $4.5 million in accordance with the forfeiture agreement.
 
 
 10
 On March 14, 1989, the Attorney General published the RICO Forfeiture Settlement Agreement, pursuant to § 1963(l )(1). On March 17, 1989, Judge McLaughlin ordered the Clerk of the Court to open a bank account to receive money paid by the defendant pending adjudication of third-party petitions to amend the order of forfeiture, and pending liquidation of Schwimmer's assets.
 
 
 11
 In April of 1989, D & E met with the Government regarding attorneys fees. Schwimmer had previously been represented by the firm Kostelanetz, Ritholtz, Tigue & Fink as trial counsel, but he sought representation by Alan Dershowitz and D & E as appellate counsel. Because the $100,000 exempted in the forfeiture order was for trial counsel, D & E wished to reach an arrangement regarding payment for partially performed and future services on appeal. Both the Government and D & E confirm that an oral agreement was reached at that time ("the April agreement"). In D & E's words, "instead of Mr. Schwimmer simply paying counsel, since all his liquid assets were now in a court controlled bank account, it was agreed that any further legal fees would be negotiated between Mr. Schwimmer and his counsel, the government would review the fees Mr. Schwimmer and his counsel had agreed on, and the fees would then be presented to the Court for approval."
 
 
 12
 In July of 1989, Judge McLaughlin considered a petition by the International Brotherhood of Teamsters Local 810 ("Local 810") and the Sheet Metal Workers Local 38 ("Local 38") (collectively, "the Unions"). The Unions petitioned the Court to amend the February 14, 1989 Agreement so that the $4.5 million would be paid to them, not to the Government. The petition was pursuant to 18 U.S.C. § 1963(l )(6), which states (in pertinent part) that a court shall amend the order of forfeiture if the court has determined by a preponderance of the evidence that:
 
 
 13
 (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section....
 
 
 14
 In an Order of July 24, 1989 Judge McLaughlin granted the Unions' petitions. United States v. Schwimmer, No. 87 Cr. 423, Order (E.D.N.Y. July 24, 1989) [hereinafter "July Order"]. He found that Schwimmer held certain commissions as a constructive trust for the Unions. July Order at 5. As a result of this finding, and the finding that the Unions lost approximately $16 million to Schwimmer and his co-defendant, Mario Renda, Judge McLaughlin concluded that the Unions were entitled to the entire $4.5 million originally forfeited to the Government. July Order at 7. He found that Local 810 was entitled to $3,428,534 and that Local 38 was entitled to $1,071,466, and stated that the Order of Forfeiture was amended to reflect the remission of those respective amounts.
 
 
 15
 Work on Schwimmer's appeals continued with D & E representing him. In October 1989, notwithstanding the July Order, D & E and the Government entered into a stipulation permitting D & E to be paid $25,000 from proceeds from the sale of jewelry. The stipulation was prepared at the behest of Judge McLaughlin's law clerk, and was "So Ordered" by Judge McLaughlin. A similar procedure was repeated three times, through September of 1990. The Unions were not given notice of any of these stipulations.
 
 
 16
 A fifth stipulation providing for payment of up to $55,000 was prepared in the Spring of 1991. The stipulation stated:
 
 
 17
 ... notwithstanding the RICO forfeiture agreement and order ... of February 14, 1989, and entered that day as an order of the Court and without violating that order, Martin Schwimmer may pay bona fide attorneys fees and costs, not to exceed $55,000.... Payment ... may be made from any sums referred to in the order dated February 14, 1989, and otherwise forfeitable to the government.
 
 
 18
 The Unions learned of this latest stipulation and objected. By this time, the case had been reassigned to Judge Spatt. In a September 30, 1991 decision, Judge Spatt declined to approve this stipulation, on the ground that the July 1989 order of remission had divested the Defendant and the Government of any right, title, or interest in the funds, and therefore neither party had any right to control its disposition. D & E appealed this decision. D & E subsequently moved the District Court to reconsider. The District Court denied that motion, and D & E also appealed the denial of the motion for reconsideration.[2]
 
 DISCUSSION
 
 19
 The RICO criminal forfeiture statute has caused alarm in a number of quarters, but two groups have felt particularly vulnerable to this law: defense attorneys, who risk non-payment if their clients' funds are found subject to forfeiture, and third-party property holders, who risk losing their property to the Government if their property appears to be the defendant's and the defendant is ordered to forfeit that property to the Government. The case before us presents a dispute between members of those groups.
 
 
 20
 Although the Supreme Court held in Monsanto and Caplin & Drysdale that the forfeiture of funds for attorneys fees does not violate the Sixth Amendment right to counsel, United States v. Monsanto, 491 U.S. 600, 109 S.Ct. 2657, 105 L.Ed.2d 512 (1989); Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989), the Attorney General has the authority under 18 U.S.C. § 1963(g)(2) to permit defendants to keep some assets otherwise forfeitable to the Government, in order to pay their attorneys. With respect to the rights of third-party property holders, § 1963(g) permits those parties to petition the Attorney General for remission of property, and § 1963(l ) permits a narrow class of interest holders to petition a Court to amend an order of forfeiture so that their property may be returned directly to them. The Appellant in this case--D & E--argues primarily that the Government validly exercised its power under § 1963(g)(2) when it compromised the Government's claim to assets in order to allow the Defendant to pay attorney's fees to D & E. The District Court decided, however, that the effect of the July Order applying § 1963(l ) was to divest the United States and the Defendant of any right to control the disposition of the funds originally forfeited to the Government. For this reason, it decided that the July Order precluded a finding that D & E had a right to be paid attorneys fees from those funds.
 
 
 21
 Following our preliminary analysis of jurisdiction, our review of this decision has three parts: first, we ask whether the District Court's analysis of D & E's rights was correct, assuming, arguendo, that the July Order was binding with respect to D & E. See II, infra. We answer this question affirmatively, and consequently decide that the July Order would have the effect of extinguishing D & E's right to be paid attorneys fees from the forfeited funds if D & E were bound by that Order. Second, we ask whether the July Order was binding on D & E, given that D & E was a non-party whose rights were extinguished by the July Order. See III, infra. We decide that D & E is not bound by that order. Third, we ask whether the July Order applied the correct legal standards to adjudicate the Unions' petitions, and in particular, whether a constructive trust warrants an amendment of an order of forfeiture under § 1963(l )(6)(A). See IV, infra. We hold that a constructive trust warrants an amendment of an order of forfeiture only if the District Court finds that the property ordered forfeited is traceable to property held in constructive trust. The District Court did not make such a finding in the July Order. We therefore remand to the District Court.
 
 I.
 
 22
 The Unions argue that this Court lacks jurisdiction to review the District Court's refusal to endorse the D & E stipulation. They argue that when D & E moved for reconsideration of the District Court's September 30, 1991 decision not to endorse the stipulation, D & E nullified its previous notice of appeal under Fed.R.App.P. 4(a)(4). The Unions recognize that a notice of appeal was timely filed in response to the District Court's denial of D & E's motion for reconsideration. They argue, however, that because the second notice of appeal fails to refer to the September 30, 1991 decision, this Court has jurisdiction to review only the denial of the motion for reconsideration, and not the underlying decision refusing to approve the stipulation. Even assuming, arguendo, that the Unions' analysis of the applicability of Rule 4(a)(4) is correct,[3] this Court cannot accept the Unions' jurisdictional argument. A virtually identical argument was rejected by the Supreme Court in Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In that case, the Appellant filed a notice of appeal of the District Court's dismissal of his complaint. Appellant's subsequent motion to vacate and amend was treated as a Rule 59 motion that rendered premature his first notice of appeal. The motion to vacate and amend was denied and the Appellant filed a second notice of appeal, but the second notice of appeal failed to reiterate that the underlying dismissal of the complaint was being appealed. On these grounds, the Court of Appeals held there was no jurisdiction to review the dismissal of the complaint.
 
 
 23
 The Supreme Court reversed, noting that "[t]he defect in the second notice of appeal did not mislead or prejudice the respondent." Id. at 181, 83 S.Ct. at 229, 9 L.Ed.2d at 225. It also held it significant that it was "manifest" from "the two notices and the appeals papers," taken together, that Appellant intended to seek review of the Rule 59 motion and of the underlying decision. Explaining the Court's flexible approach, Justice Goldberg wrote: "[i]t is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities." Id. at 181, 83 S.Ct. at 230, 9 L.Ed.2d at 225.
 
 
 24
 Foman applies squarely to the case before us. We find that the alleged defect caused no prejudice to the Unions and that D & E's intention to seek review of the underlying decision was manifest.
 
 II.
 
 25
 D & E presents several arguments intended to show that the Order of July 24, 1989, did not have the effect of extinguishing D & E's right to attorneys fees. For the reasons set forth below, we reject each of D & E's arguments.
 
 A. Property Ordered Forfeited
 
 26
 Appellant argues that the assets released by the September stipulation are assets that were never remitted to the Unions. The simplest basis for this argument is the contention that the order of remission merely orders Schwimmer to pay the Unions $4.5 million; it does not specify any particular funds or assets that he is required to pay to the Unions. D & E concedes that the use of assets to pay for attorneys fees may diminish, to some degree, Schwimmer's actual ability to satisfy his debt of $4.5 million. However, D & E maintains that the stipulation in no way diminishes Schwimmer's debt, and that, therefore, it does not diminish the property ordered forfeited.
 
 
 27
 This position does not square with the language of the RICO Forfeiture Settlement Agreement, which provides that:
 
 
 28
 The Defendant agrees to satisfy the Liquidated Claim by paying to the Government all of his current cash on hand and the proceeds, from sale or otherwise, of all property interests owned by Defendant, excluding, however, a 1980 Mercedes Benz ... and his personal residence at Two Stream Court, Kings Point, N.Y., but including, inter alia, the properties identified on Exhibit A annexed hereto (collectively, the "Collateral"), less the amount of $100,000, which is to be paid by Defendant for bona fide attorney fees in connection with this criminal case....
 
 
 29
 Indeed, in sentencing Schwimmer, Judge McLaughlin stated that he was ordering the forfeiture of $4.5 million dollars "in accordance with the forfeiture agreement." We therefore conclude that the Defendant was ordered, not only to pay the Government the amount of $4.5 million, but also to make that payment by forfeiting to the Government his cash on hand and forfeiting to the Government the proceeds from the liquidation of enumerated assets. Because, as D & E concedes, the remission order places the Unions in the shoes of the Government, that order amends the order of forfeiture so that the Defendant is obligated to make his payment to the Unions by forfeiting to the Unions his cash on hand and the proceeds from the liquidation of enumerated assets.
 
 B. The Oral Modification
 
 30
 Appellant asserts that Judge Spatt erroneously failed to recognize the validity of the oral modification of the RICO Forfeiture Settlement Agreement. See United States v. Paccione, 948 F.2d 851, 857 (2d Cir.1991) (forfeiture agreement to be treated like contract). Appellant correctly asserts that an oral modification to a contract may be valid, even if the contract was in writing and it expressly forbade oral modifications. Under New York law, a contractual prohibition against oral modification may be waived by a course of conduct. See Rose v. Spa Realty Assocs., 42 N.Y.2d 338, 366 N.E.2d 1279, 397 N.Y.S.2d 922 (1977). This is particularly true where there has been performance in reliance on the oral modification. Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 522 (2d Cir.1990).
 
 
 31
 In the case at bar, D & E performed legal services for Schwimmer in reliance on the oral modification to the settlement agreement. Moreover, the Government itself performed the contract as orally modified by stipulating to the withdrawal of attorneys fees on several occasions (including the stipulation in question here). Under these circumstances, the oral modification of the forfeiture agreement to permit Schwimmer to withdraw bona fide attorney's fees with the approval of the Government is of a sort that would be valid, were we merely interpreting a contract. Indeed, in light of Paccione's requirement that contract principles determine whether the Government has waived a right in a RICO forfeiture settlement agreement, we would be strongly inclined to find that the Government waived its right to claim money Schwimmer spent on these attorneys fees under the original RICO Forfeiture Settlement Agreement. Thus, had there been no successful third-party petitions under § 1963(l ) and had the Government itself refused to stipulate to Schwimmer paying bona fide attorneys fees, we would likely find that Schwimmer should prevail against the Government.
 
 
 32
 However, the case at bar presents a different question: whether the Government's oral agreement, in the presence of Judge McLaughlin, to permit withdrawal of funds to pay bona fide attorneys fees, effected an amendment to the District Court's order of forfeiture. The answer to that is no. An agreement between parties does not, in and of itself, constitute an amendment to an order of forfeiture. The need for an actual court order is particularly strong where, as here, there is a statutory requirement that outside persons be given notice of orders of forfeiture and of the government's intent to dispose of the property, and there is a statutory requirement that such persons be given an opportunity to object. 18 U.S.C. § 1963(l )(1), (2). It is implicit in this requirement that any amendment to an order of forfeiture be made by court order, and that third parties be given notice of amendments to orders of forfeiture.
 
 
 33
 The record contains no evidence that, prior to the issuance of the July Order on July 24, 1989, Judge McLaughlin, either orally or in writing, issued a modification or an amendment to the order of forfeiture that incorporated the agreement between the Government and the Defendant. No notice was published concerning the alleged oral amendment to the order of forfeiture. Although it might be argued that Judge McLaughlin's "so ordering" of a stipulation on October 19, 1989, was sufficient to amend the order of forfeiture, this argument fails for two reasons. First, he "so ordered" the stipulations after the July order of remission, at which time the Court was no longer free to dispose of the funds (unless it vacated its order of remission), and second, the United States failed to comply with the statutory requirement that it publish notice of the order.
 
 C. § 1963(g)(2)
 
 34
 A more plausible argument is that the April agreement should be viewed as an exercise of the Government's power under § 1963(g)(2) to compromise claims, and not as an amendment to the order of forfeiture. 18 U.S.C. § 1963(g)(2) (Attorney General is authorized "to compromise claims arising under this section"). However, this argument also fails, because § 1963(l ) places certain conditions on the authority of the Attorney General to dispose of the property ordered forfeited. In particular, the United States does not have clear title to the property that is the subject of the order of forfeiture until the adjudication of petitions under § 1963(l ) (or the expiration of the period for filing such petitions), and the United States may not warrant good title to any subsequent purchaser or transferee until that time. 18 U.S.C. § 1963(l )(7).[4] The implication of this provision is that the Attorney General's authority to dispose of property under § 1963(g) is subject to the condition that the order of forfeiture not be found invalid during the § 1963(l ) petition adjudication period.[5] Otherwise, a petitioner might find that, even though she had demonstrated that the property ordered forfeited was her own, under § 1963(l )(6)(A), and that, therefore, an amendment to the order of forfeiture was warranted, the United States might already have used, liquidated, or disposed of that property under § 1963(g).
 
 
 35
 Thus, the authority of the United States to dispose of property ordered forfeited to it is contingent upon the Government's right to that property surviving any third-party challenge under § 1963(l ). Consequently, if the United States promises to dispose of forfeited funds or assets a certain way, and that promise is made prior to the adjudication of § 1963(l ) petitions or the expiration of the time permitted for such petitions, then that promise is implicitly subject to a condition that the funds or assets not be remitted to a third party under § 1963(l ).
 
 
 36
 The Government's promise to permit Schwimmer to draw funds to pay attorneys fees was made prior to the adjudication of § 1963(l ) petitions. Thus, the Government could agree to allow Schwimmer to exempt certain property only to the extent that the Government's interest in the exempted property was superior to the interests of a subsequent § 1963(l ) petitioner.
 
 
 37
 If the July Order was binding on D & E, the Unions would now be in a position to argue that the Government and the Defendant lacked power over the property in question to the extent that the Unions, to whom the property was owed, could demonstrate their entitlement to the property. In that event, the Court would have been correct to refuse to approve the stipulation.
 
 III.
 
 38
 The District Court's decision that D & E is not entitled to the enforcement of the § 1963(g)(2) compromise was premised on the July Order. For the reasons stated below, we conclude that the July Order is not binding as to D & E.
 
 
 39
 The Restatement (Second) of Judgments provides that in some situations, non-parties to an adjudication may be entitled to relief from the effects of that judgment:
 
 
 40
 § 76. Person Not Bound by the Judgment
 
 
 41
 Subject to the limitations stated in § 74, a person who is not bound by a judgment under the rules of res judicata may obtain a determination that the judgment is ineffective as to him through an action to restrain enforcement of the judgment, for a declaration that the judgment is ineffective as to him, or similar relief, when:
 
 
 42
 (1) The existence of the judgment jeopardizes a protectible interest of his; and
 
 
 43
 (2) The character of his interest warrants his being given relief forthwith rather than on a future occasion.
 
 
 44
 Restatement (Second) of Judgments, § 76 (1982) [hereinafter "Restatement"].
 
 
 45
 The Supreme Court's doctrine of non-party relief from judgment is, if anything, broader than that found in the Restatement. In Martin v. Wilks, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), the Court firmly stated that non-parties to a judgment are not normally bound by that judgment. Id. at 761-62, 109 S.Ct. at 2184, 104 L.Ed.2d at 844. It then concluded that a third party is entitled to have a dispute readjudicated insofar as it regards him or her, even if he or she knowingly passed up the opportunity to intervene. Id. at 765, 109 S.Ct. at 2186, 104 L.Ed.2d at 846 ("knowledge of a lawsuit" and "opportunity to intervene" do not bind non-party to judgment or decree).
 
 
 46
 In light of the broad protection to non-parties offered in Martin v. Wilks, and in light of this Court's own willingness to mitigate the effect of preclusive doctrines on occasion,[6] it is appropriate to afford D & E at least the protection offered by Restatement § 76. See also, In re Lovitt, 757 F.2d 1035, 1039 (9th Cir.), cert. denied, 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985) (adopting Restatement (Second) of Judgments § 76).
 
 A. Res Judicata
 
 47
 D & E was not a party to the proceedings under § 1963(l ). D & E also represented to the District Court that it did not receive notice of the July 1989 Order, and it did not even know of the Order until Judge Spatt informed D & E in September of 1991. These representations have not been contested by the Unions. Moreover, we find that D & E was not in privity with the Government or with Schwimmer.
 
 
 48
 Although Martin v. Wilks does not require intervention by non-parties, we think it worth noting that D & E did not have a duty to intervene in the § 1963(l ) proceedings in any case. First, § 1963(l ) does not give a beneficiary or promisee of the Government's promises under § 1963(g) standing to intervene in a § 1963(l ) adjudication. Without reaching the question of whether a non-statutory basis for standing could have been asserted to establish participation in this § 1963(l ) adjudication, we think the absence of a statutory basis at the very least excuses D & E's non-participation. Second, D & E did not believe that the outcome of the § 1963(l ) adjudication had a bearing on its interests. D & E believed that the Government's promise to permit withdrawal of bona fide attorneys fees was a valid compromise under § 1963(g)(2), and would remain in effect regardless of the outcome of § 1963(l ) petitions. The record suggests that the Assistant United States Attorneys and the District Court shared this view, and communicated that to D & E. Given this, and given the dearth of authority on § 1963(l ), D & E's belief was reasonable.
 
 B. Protectible Interest
 
 49
 The Restatement suggests that relief from prior judgments has been granted "on the ground of mistake where a limited fund has been ordered distributed to one claimant and another seeks to show that his claim to the fund is of equal or superior standing." Restatement § 76, comment a. For example, in Gardner v. Trevaskis, 158 Cal.App.2d 410, 322 P.2d 545 (1st Dist.1958), a lower court had ordered the administrator of an estate to distribute part of the estate to one party. A third party petitioned the Court to set aside the earlier court order on the ground that it had been issued based on a mistake. The trial court granted the petition, and the appellate court affirmed. Similarly, in Bannock Title Company v. Lindsey, 86 Idaho 583, 388 P.2d 1011 (1963), a creditor was permitted to attack a previous judgment against the debtor by a competing creditor because the judgment was based on mistake. In a more recent case, the Ninth Circuit applied Restatement § 76 in the context of a creditor seeking to set aside a bankruptcy court's confirmation of a sale of assets, where the creditor was not given notice of the sale and his rights were thereby compromised, stating "where a non-party claims an interest in property which is affected by a judgment between others, the non-party may seek a determination that the judgment does not cloud his title." Lovitt, 757 F.2d at 1039.
 
 
 50
 The principle underlying all of these decisions is that where there is a limited fund, and competing claimants, a court's mistake benefitting a party with an interest in that fund should not prejudice the interests of a claimant who was not a party to the litigation, and who did not have a duty to participate in the litigation, at least if appropriate relief can be fashioned without too great a disturbance of the repose of the original claimants.
 
 
 51
 In the case at bar, there is a limited fund, an order that the fund be distributed to the Unions, and a third party (D & E) whose interest is effectively extinguished by that order. Relying on the principles articulated, if the July Order was ill-founded, D & E is entitled to relief from the effect of the Order.
 
 
 52
 Our holding should not be understood to imply that any potential recipient of remuneration under § 1963(g) has standing to challenge a § 1963(l ) adjudication, before or after the adjudication's appeal period has expired. On the contrary, Restatement § 76 must be used sparingly in this context as in others. We emphasize the exceptional circumstances of this case: the Government concedes that it promised D & E the funds in question after the order of forfeiture but before the adjudication of § 1963(l ) petitions; the parties do not contest that D & E performed services in reliance upon that promise; the District Court believed and led D & E to believe that the promise was enforceable regardless of the disposition of the § 1963(l ) adjudication; and the Court of Appeals had not ruled on whether § 1963(g)(2) compromises depend for their validity upon the disposition of the § 1963(l ) petitions.
 
 IV.
 
 53
 We turn next to the July Order itself. Ordinarily, we would not determine the merits of a reopened adjudication prior to the District Court's own reassessment. However, where the premise of the non-party's request for relief calls into question the correctness of the legal standards applied at the District Court, it may on occasion be inefficient to remand without considering the appropriate legal standards.
 
 
 54
 In his decision of July 24, 1989, Judge McLaughlin stated that he was amending the forfeiture order pursuant to § 1963(l )(6)(A) to reflect that Local 810 was entitled to $3,428,534, and Local 38 to $1,071,466. Finding that Schwimmer was a fiduciary of the Unions and violated his fiduciary duty to the Unions by failing to disclose commissions received from the investment of employee benefit plan funds, he inferred that Schwimmer held those commissions in a constructive trust. Noting that the constructive trust was an interest superior to Schwimmer's for quantities exceeding $4.5 million, he then found the Unions to have an interest under § 1963(l )(6)(A), and concluded that the forfeiture order should be amended to reflect that finding.
 
 
 55
 The discussion below concludes that there is not a sufficient basis in the July Order to support a finding that the property ordered forfeited should be remitted to the Unions pursuant to § 1963(l )(6)(A). The July Order at times treated the Unions as general creditors asserting an interest in none of the property ordered forfeited, and at times treated the Unions as having an interest in the property ordered forfeited that was superior to Schwimmer's, on the ground that Schwimmer held assets in constructive trust for the Unions. We deal with those strands of the July Order in turn. Part A holds that general creditors are not entitled to remission under § 1963(l )(6)(A). Part B concludes that the District Court's use of a constructive trust theory is insufficient to warrant remission under § 1963(l )(6)(A), because the District Court did not trace the assets ordered forfeited to Schwimmer's unlawfully obtained commissions.
 
 A. General Creditors
 
 56
 The Order states, "[a]s an initial matter, the Court notes that none of the petitioners assert either title to or interest in any specific asset in the combined forfeiture pool. Thus, petitioners are relegated to the category of general creditors." July Order at 4. It is therefore a pivotal issue whether a general creditor has an interest in property ordered forfeited sufficient to warrant an order of remission under § 1963(l )(6)(A). Section 1963(l )(6)(A) provides that:
 
 
 57
 If, after a hearing, the court determines that the petitioner has established by a preponderance of evidence that:(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section ...
 
 
 58
 the court shall amend the order of forfeiture in accordance with its determination.
 
 
 59
 18 U.S.C. § 1963(l )(6).
 
 
 60
 This subsection essentially sets forth five elements that must be demonstrated if a petitioner is to be granted an amendment of the order of forfeiture under § 1963(l )(6)(A):
 
 
 61
 (i) The petitioner must assert a right, title, or interest;
 
 
 62
 (ii) that right, title, or interest must be in the property "which has been ordered forfeited to the United States"[7] pursuant to § 1963;
 
 
 63
 (iii) that right, title or interest must be legal;
 
 
 64
 (iv) that right, title or interest must render the order of forfeiture invalid in whole or in part;
 
 
 65
 (v) the reason that it renders the order of forfeiture invalid, in whole or in part, must be that either: (a) the third party's interest in the property ordered forfeited was vested at the time of the commission of acts in question, or (b) the third party's interest in the property ordered forfeited was superior to the defendant's interest at the time of the commission of the acts.
 
 
 66
 Our question is therefore whether a general creditor asserting neither "title to nor interest in any specific asset in the combined forfeiture pool" could satisfy these five elements of § 1963(l )(6)(A), with respect to the forfeiture pool.
 
 
 67
 The most important of these elements for our purposes are the second and the fourth, the requirements that the interest be "in" the property forfeited and that such interest render the order of forfeiture invalid in whole or in part. The Senate Report explains why some third-party interests might invalidate an order of forfeiture. If the Order requires that property be forfeited to the Government, and that property actually belongs to a third party, then, the Report contends, the Court is ordering the forfeiture of property over which it lacks jurisdiction and the order is therefore invalid:
 
 
 68
 Criminal forfeiture is an in personam proceeding. Thus, an order of forfeiture may reach only property of the defendant, save in those instances where a transfer to a third party is voidable. Thus, if a third party can demonstrate that his interest in the forfeited property is exclusive of or superior to the interest of the defendant, the third party's claim renders that portion of the order of forfeiture reaching his interests invalid. The Committee strongly agrees with the Department of Justice that such third parties are entitled to judicial resolution of their claims.
 
 
 69
 S.Rep. No. 225, 98th Cong., 2nd Sess., reprinted in 1984 U.S.Code Cong., & Admin.News 3182, 3391. See also, Hearings Before the Subcommittee on Crime of Committee on the Judiciary, House of Representatives, 98th Cong., 1st Sess. on H.R. 3272, H.R. 3299, and H.R. 3725, Comprehensive Drug Penalty Act, 4-16, 15 (1983) (testimony of James Knapp, Deputy Assistant Attorney General, Criminal Division, suggesting judicial resolution appropriate for third parties whose interests are "by their very nature inconsistent with the order of forfeiture"). An order of forfeiture pursuant to a settlement agreement is equally vulnerable to invalidation by third-party interests, because a defendant's consent to forfeit property does not expand the Court's power over that property, if the property is not the defendant's own.
 
 
 70
 We turn then to the question of whether a general creditor has an interest in property ordered forfeited that invalidates an order of forfeiture. We hold that it does not. The fact that the defendant owes a debt to the general creditor does not, in and of itself, prevent a Court that has in personam jurisdiction from asserting jurisdiction over the assets of that defendant.
 
 
 71
 As the passage quoted from the Senate Report suggests, the categories of vested and superior are intended to cover those cases where the Court lacks jurisdiction over the property because it is not really "property of the defendant." A general creditor has no interest in a particular asset or particular funds that is either vested or superior to a defendant's. He may have a right to receive payment, but he does not have a property interest superior to defendant's in any particular asset or funds until he has obtained some judgment and secures that asset or those funds. At that point, he is no longer merely a general creditor. Thus, the property remains property of the defendant even as against the claim of a general creditor. The general creditor's interest therefore does not threaten to undermine the Court's jurisdiction over the property, and does not invalidate the order of forfeiture. Thus, a general creditor has no interest in particular assets or funds that warrants an amendment of an order of forfeiture under § 1963(l )(6)(A).[8]
 
 B. Constructive Trusts
 
 72
 Despite its finding that the petitioners were general creditors, the District Court also appears to have found that the petitioners asserted an interest superior to that of the defendant, because the Unions were beneficiaries of a constructive trust, of which Schwimmer was the trustee. If the interest is superior, then the order of forfeiture is rendered invalid and the amendment to that order is warranted. This is the premise of the July Order:
 
 
 73
 Petitioners contend that they have a "legal interest" in the forfeited property and, therefore, are entitled to recovery of that property. As an initial matter, the Court notes that none of the petitioners assert either title to or interest in any specific asset in the combined forfeiture pool. Thus, petitioners are relegated to the category of general creditors. As such, petitioners must assert an interest in the forfeited funds that is superior to the interest of the defendants at the time of the commission of their crimes. See United States v. Campos, 859 F.2d 1233, 1238 (6th Cir.1988). "Such a superior interest would clearly be one in the nature of a lien [or] constructive trust...." See id., 859 F.2d at 1238-39.
 
 
 74
 July Order at 4-5.
 
 
 75
 There are two potential weaknesses in this argument. First, constructive trusts appear to be excluded by § 1963(l )(6)(A), which is explicitly limited to legal rights, titles or interests; and second, constructive trusts require that the property in constructive trust be traced.1. Equitable Interests Under § 1963(l )(6)(A)
 
 
 76
 A constructive trust is an equitable interest, not a legal interest. Healy v. Commissioner, 345 U.S. 278, 282, 73 S.Ct. 671, 674, 97 L.Ed. 1007, 1012 (1953) ("[a] constructive trust is a fiction imposed as an equitable device for achieving justice"). The equitable nature of constructive trusts presents a potential problem in this context because § 1963(l )(2) explicitly requires a "legal interest" even for standing to petition, and § 1963(l )(6)(A) explicitly requires a "legal right, title, or interest" for the amendment of an order of forfeiture. Black's Law Dictionary defines "legal interest" as an "interest in property or in claim cognizable at law in contrast to equitable interest." Black's Law Dictionary, 894 (6th ed. 1990). This is consistent with the legislative history, which provides explicitly that, even after the enactment of § 1963(l ), petitioning the Attorney General under § 1963(g) "would remain the appropriate exclusive remedy for third parties who assert not a legal basis for relief, but rather mere equitable grounds." S.Rep. No. 225, 98th Cong., 2nd Sess., reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3391. See also, M. Goldsmith & M. Linderman, Asset Forfeiture and Third Party Rights: the Need for Further Law Reform, 1989 Duke L.J. 1254, 1286 & n. 136 ("only claimants with a legal--as opposed to equitable--interest in property may contest forfeiture").
 
 
 77
 On the other hand, "legal" is also defined more broadly, to mean "according to law" or "proper or sufficient to be recognized by the law." Black's Law Dictionary, 892. Thus, a "legal right, title, or interest" might be taken to mean any right, title, or interest recognized under the law. See Reckmeyer, 836 F.2d at 205 ("the term 'legal interest' [in § 853(n)(2) ] encompasses all legally protected rights, claims, titles, or shares in real or personal property"). The Senate Report's exclusion of "mere equitable remedies" also supports this alternative interpretation, because "equitable" is also ambiguous. While it can mean "existing at equity," as described above, it can also mean "conformable to the principles of justice and right." Black's Law Dictionary, 537. Accordingly, the Senate Report may be interpreted to exclude from section l those who claim a right or interest in the property ordered forfeited, but rely upon principles of justice or fairness for that claim, rather than demonstrating a right or interest under some principle of law.
 
 
 78
 We therefore confront an ambiguity in the term "legal." It may be interpreted to mean "traditionally enforceable at law," as opposed to "traditionally enforceable at equity," or it may mean, "according to the law" as opposed to "according to what is considered just and equitable." The Third Circuit thought the latter interpretation of the "legal"/"equitable" distinction was "obviously" the correct one. "In distinguishing between 'legal' and 'equitable' bases for relief. Congress obviously intended the word 'equitable' to be accorded its more general meaning ('fair and just') as opposed to its technical meaning as understood by lawyers ('existing in equity')." Lavin, 942 F.2d at 185 n. 10. The Fourth Circuit also appears to have adopted the broader view of legal interests, noting that in Russello v. United States, 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983), the Supreme Court approved a broad construction of the term "interest." Reckmeyer, 836 F.2d at 205. Moreover, the Sixth Circuit in United States v. Campos, 859 F.2d 1233, 1238-39 (6th Cir.1988) has explicitly stated (in dicta ) that a "constructive trust" would qualify as "superior" under § 853(n)(6)(A), and the Seventh Circuit has actually held that a constructive trust warrants a remission under § 853(n)(6)(A). United States v. Marx, 844 F.2d 1303, 1308 (7th Cir.1988). However, neither the Sixth Circuit nor the Seventh Circuit actually addressed the question of whether the language of the section excluded interests traditionally enforceable only at equity.
 
 
 79
 We agree with the Third Circuit and the Fourth Circuit and hold that the term "legal" in § 1963(l ) should be interpreted to mean "under the law." Following Campos and Marx, we also hold that a constructive trust may be a superior interest under § 1963(l )(6)(A).2. Constructive Trusts and the Property Ordered Forfeited
 
 
 80
 Even though we hold that § 1963(l )(6)(A) applies to constructive trusts, the basis of the July Order is nevertheless infirm because the District Court did not find that the property ordered forfeited was held in a constructive trust:
 
 
 81
 Schwimmer, a fiduciary of Locals 810 and 38, violated his fiduciary duty by failing to disclose the receipt of commissions. Therefore, he held those commissions in constructive trust for the respective locals upon receipt. See A.W. Scott § 462.4. The same analysis applies to Renda who pleaded to the RICO count with 18 U.S.C. § 1954 as the predicate acts.
 
 
 82
 Accordingly, the Court finds by a preponderance of the evidence that Local 810 and Local 38 assert an interest in the forfeited funds superior to that of defendants.
 
 
 83
 July Order at 5-6.
 
 
 84
 This passage suggests that the District Court reasoned directly from the premise that Schwimmer was a constructive trustee of certain commissions to the conclusion that the Unions' interest in the property ordered forfeited was superior to that of the defendants. However, the former premise serves, at most, to show that the petitioners have an interest superior to the defendants' in the commissions or in property traceable to the commissions. The beneficiary of a constructive trust does not have an interest superior to the trustee's in every asset the trustee holds, but only in those assets held in constructive trust or traceable to such assets. United States v. Benitez, 779 F.2d 135, 140 (2d Cir.1985) ("It is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer"); 1 Palmer, Restitution, § 2.14 (equitable interest must be traced to identifiable property). The District Court made no finding in this case that any of the property ordered forfeited was traceable to the commissions held in constructive trust. Indeed, as mentioned above, the District Court noted specifically that "none of the petitioners assert either title to or interest in any specific asset in the combined forfeiture pool." July Order at 4. Moreover, throughout the Order, the District Court not only considered the two defendants' assets in one undifferentiated pool, it also pooled together the claims of the Unions, without considering which Union had claims to which assets or funds.
 
 
 85
 We note, however, that this Court applied a relaxed tracing standard in Benitez, where a defrauder's funds were said to be held in constructive trust for the parties he defrauded. The Court found it necessary to trace the funds in question to the alleged fraud. However, it found this requirement met because it found the defrauder had "acquiesced in the release of any claim to the fund." Id. at 140. Specifically, the defrauder in Benitez turned over several negotiable instruments and gems to the Government, and the defrauder did not object to the Government's characterization of those items as "fruits of the crime." Id. at 138.
 
 
 86
 Benitez is distinguishable from this case both on the facts and on the law. First, we have no evidence of acquiescence here by Schwimmer. On the contrary, in the RICO Forfeiture Settlement Agreement, the Government explicitly withdrew the forfeiture counts against Schwimmer, and therefore the Government withdrew its claim connecting Schwimmer's property to the criminal acts for which he was convicted. Moreover, the Settlement Agreement explicitly states that it should not be used as evidence relating to criminal proceedings. Not only does this indicate an absence of acquiescence, it also suggests that it would be highly inappropriate to assume that the assets and funds used to satisfy the obligation assumed by Schwimmer in the Settlement Agreement were the proceeds of the crime for which he was convicted.
 
 
 87
 Second, Benitez is not a RICO criminal forfeiture case, but rather a complex interpleader case in which the defrauded parties had obtained summary judgment against the defrauder; a Special Master was appointed, and on his recommendation, the District Court decided that a fund of assets seized by the FBI (and turned over by the defrauder) should be shared pro-rata among the defrauded parties, on a constructive trust theory. In essence, the District Court in Benitez attempted to act in a fair and just manner by using a pool of assets and funds to compensate numerous victims of fraud. To the extent that this Court tolerated a very relaxed tracing standard in Benitez, it was with an eye to permitting the District Court to exercise this general, victim-compensation function, without being hampered by strict definitions of property rights.
 
 
 88
 The July Order indicates that the District Court here, as in Benitez, was similarly motivated to use a pool of assets to compensate victims of the defendant's crime. However, the case at bar, unlike Benitez, is governed explicitly by a statute that states that the Attorney General, and not the judiciary, shall make decisions about how to divide up funds in order to compensate victims. The only role of the District court is to amend the order of forfeiture where a genuine property interest of the sort specified in § 1963(l )(6) is demonstrated. Because Congress has chosen to allocate to the Attorney General the power to remit funds for victim compensation, it is inappropriate in the context of this case to relax conceptions of property rights in order to permit courts to compensate victims.
 
 
 89
 We therefore conclude that, as a matter of law, the findings of the July Order are insufficient to show that the property ordered forfeited to the Government was held in constructive trust for the Unions.
 
 
 90
 Accordingly, we remand to the District Court for a tracing inquiry. If it is necessary to consider commingled funds in making the tracing determinations, the Court shall be guided by applicable rules concerning commingled funds. See V William F. Fratcher, Scott on Trusts §§ 515-20 (4th ed. 1989).
 
 
 91
 In recognition of the interest in maintaining repose, the matter should be reopened only to adjudicate the dispute between D & E and the Unions as to the correctness of the District Court's September 1991 decision refusing to approve D & E's most recent stipulation concerning attorneys fees. On remand, the District Court should focus on the funds that the most recent stipulation would permit Schwimmer to use. Unless the petitioners can show that any of the funds or assets that D & E proposed to be used as a source of its payment can be traced to Schwimmer's improperly received commissions, the District Court shall approve the stipulation and order the payment of such bona fide attorneys fees as were incurred.
 
 CONCLUSION
 
 92
 For the foregoing reasons, we remand this matter to the District Court.
 
 
 
 [1]
 Hon. Kimba M. Wood, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [2]
 The United States, although nominally the Appellee, appears in support of Appellant D & E and in opposition to the Intervenor Unions
 
 
 [3]
 The Unions' argument that Fed.R.App.P. 4(a)(4) applies rests on the premise that a § 1963(l ) forfeiture proceeding is a civil case for purposes of appellate procedure, even though it is related to, and arises within, a criminal proceeding. In support of this position, the Unions point to the well-reasoned analysis of the Third Circuit in United States v. Lavin, 942 F.2d 177, 181-82 (3d Cir.1991). Lavin held that for purposes of appellate procedure, a forfeiture proceeding under 21 U.S.C. § 853(n) is a civil case. In light of the discussion, infra, we need not reach the question of whether the Lavin analysis applies to § 1963(l )
 
 
 [4]
 The actual language of § 1963(l )(7) provides that the United States shall have clear title once the petitions have been adjudicated; it does not state explicitly that the United States shall not have good title before then. However, in light of the purpose of § 1963(l ) to prevent the forfeiture of property in which third parties have certain kinds of legal interests, and the suggestive language of § 1963(l )(7), we conclude that § 1963(l )(7) was intended to require the Government's claim to survive the adjudication process before the Government can take good title to property ordered forfeited
 
 
 [5]
 Section 1963(l ) applies only after an order of forfeiture has been entered. We therefore do not question the Government's ability to compromise claims under § 1963(g)(2) prior to the entry of an order of forfeiture
 
 
 [6]
 See, e.g., Griffith v. Bank of New York, 147 F.2d 899 (2d Cir.1945), cert. denied, 325 U.S. 874, 65 S.Ct. 1414, 89 L.Ed.1992 (1945) (permitting non-party relief from effect of mistaken judgment); cf. La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc., 495 F.2d 1265 (2d Cir.1974) (Friendly, J.) ("[a]s we have noted on several occasions, res judicata principles, if applied inflexibly, can at times result in unwarranted hardship")
 
 
 [7]
 18 U.S.C. § 1963(l )(2) (emphasis added). Note that § 1963(l )(6)(A) refers only to "the property," without specifying which property. The most natural assumption, both grammatically and contextually, is that the referent of the elliptical noun phrase "the property" is the same as the referent of the fuller noun phrase in § 1963(l )(2), i.e., "the property ordered forfeited to the United States pursuant to this section...."
 
 
 [8]
 To our knowledge, no court has held differently with respect to § 1963(l )(6)(A) (or the analogous 21 U.S.C. § 853(n)(6)(A)). Although it was not required to reach the issue, the Third Circuit in Lavin suggested that because the petitioner in that case was able to "assert no more than a general claim against [the defendant's] estate," the petitioner was "unable to take advantage" of § 853(n)(6)(A). United States v. Lavin, 942 F.2d 177, 187 n. 12; see also, United States v. Reckmeyer, 836 F.2d 200, 206 (4th Cir.1987) ("although general creditors can claim an interest in their debtors' estates, they cannot claim an interest in any particular asset that makes up that estate"). While some courts have found that general creditors have standing to petition a District Court under § 853(n)(2), Reckmeyer, 836 F.2d at 206 (§ 853(n)(2) standing available to general creditors); United States v. Campos, 859 F.2d 1233 (6th Cir.1988) (following Reckmeyer on standing, in dicta ), and the Reckmeyer court found that general creditors might be entitled to an order of remission under subsection § 853(n)(6)(B), Reckmeyer, 836 F.2d at 208, the foregoing analysis is not intended to reach the issue of a general creditor's rights under § 853(n). We note, moreover, that unlike § 1963(l )(6)(A), neither § 853(n)(6)(B) nor § 853(n)(2) includes a requirement that the interest be such as to invalidate the order of forfeiture, or that it be vested or superior